C. C. VICKERS *et al.* v. BUCK STOVE AND RANGE COMPANY *et al.*

### No. 11197.

1. FRAUDULENT CONVEYANCE — *Presumption of Law.* The insolvency of a vendor may be considered in connection with other material facts in determining the good faith of the parties to a sale of property, but it cannot be said as a matter of law that a knowledge of the insolvency of the vendor alone is sufficient to charge the purchaser with notice of a fraudulent intent on the part of the vendor.

2. PRACTICE, DISTRICT COURT — *Jury Trial in Equity Case.* Where the facts in an equity case are submitted to the determination of a jury and the case is tried as though a jury trial was a matter of right, the jury instructed as to the law of the case, and their findings accepted by the court, an erroneous instruction given to the jury, indicating that the case was tried upon an er-

roneous theory and that an incorrect rule was applied in weighing the testimony and in measuring the rights of the parties, is sufficient ground for reversal.

Error from Morris district court; O. L. MOORE, judge. Opinion filed June 10, 1899. Reversed.

*Allen & Allen,* and *Charles B. Graves,* for plaintiffs in error.

*M. B. Nicholson,* and *E. S. Bertram,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J. : The creditors of W. L. Vickers & Co. brought this action to set aside a conveyance of lands made by C. C. Vickers and wife to P. B. Maxson, upon the alleged ground that the conveyance was made to defraud the creditors of W. L. Vickers & Co. This firm was engaged in the hardware and implement business at Wichita Falls, Tex., and was composed of C. C. Vickers and his nephew W. L. Vickers. C. C. Vickers resided in Kansas, where he owned a large farm, and also an interest in a bank at Dunlap, of which he was president. He furnished the greater part, if not all, the capital that was invested at Wichita Falls, while W. L. Vickers was the active manager of the business, and contributed but little except experience toward the capital of the firm. The business was started in 1891, and many sales were made upon credit, so that when C. C. Vickers went to Wichita Falls in 1894 the assets of the firm consisted of a stock of merchandise worth about $7000, and notes, mortgages and accounts amounting to $17,700. C. C. Vickers determined to close out the business, and a sale of the goods on hand was made to two of the creditors for $7000. There remained debts of the

firm to the amount of $11,000, and to secure this indebtedness the notes, mortgages and accounts due the firm, amounting to $17,700, were assigned and transferred to a trustee for the creditors, who was charged with the duty of collecting the same and applying the proceeds to the payment of such indebtedness. Only a small part of the notes and accounts had been collected by the trustee when the testimony in the case was taken, and hence the creditors are seeking satisfaction from the property of C. C. Vickers.

About the time that C. C. Vickers closed out his business in Texas, a sale of the land in controversy was made to P. B. Maxson, his father-in-law. The price of the land was fixed at $8500. It was subject to a mortgage for $3000, and Maxson agreed to assume the payment of the mortgage and to pay $5500 more. One thousand dollars was to be payable in ten days, and he executed two notes for $2250 each, due in six and twelve months. The bargain was made by Mrs. Vickers, and it was subject to the ratification of her husband, who was then in Texas. He ratified the sale and joined in the execution of the conveyance.

The creditors contend that the transfer was not an honest one, but was made to defeat and defraud them; that while the amount of the notes and accounts of the firm exceeded its indebtedness, it was well known that a part of them was not good and that they were not worth to exceed fifty per cent. of their face value; that C. C. Vickers was in Texas about three months, and must have known the financial responsibility of the men who owed the firm. And it is also claimed that Maxson knew, or should have known, of Vickers's circumstances and fraudulent purpose; and, further, that while the negotiations were pending for the sale of the land he went to Texas,

where Vickers then was, and had an opportunity to learn that Vickers was insolvent and that the sale was fraudulent.

On the other side, it is contended that Vickers thought his Texas assets were sufficient to pay the Texas liabilities, and that quite a sum would remain; that the sale was only made to meet an obligation to the Dunlap bank, which was pressing, because it was an overdraft on a bank of which he was president; that the violation of law was liable to be exposed by a bank-examiner, and lest financial disgrace should result he decided to sell his land; that Maxson knew of this stress, and agreed to buy the land to relieve it and the anxiety of Mrs. Vickers, his daughter, because of it; that he had no knowledge of any fraudulent purpose of Vickers, nor of any facts that would upon diligent inquiry have disclosed it; that the information he gained in Texas was that the Texas assets were more than sufficient to pay the liabilities of the firm; that Vickers so represented, and that he in good faith believed him.  There was some testimony tending to sustain the various contentions of the parties, and the principal questions raised in this review arise upon the instructions given to a jury which was impaneled to try the facts.

Complaint is made of the seventh and eighth instructions, to the effect that actual knowledge by the vendee of the fraudulent intent of the vendor need not be shown in order to avoid the sale, but that a knowledge of facts sufficient to excite the suspicions of a prudent man and put him upon inquiry will be sufficient.  The principle embodied in these instructions is fairly within the authorities, and has passed beyond the stage of controversy into settled judgment. (*Phillips v. Reitz*, 16 Kan. 401; *Kurtz v. Miller*, 26 id. 314;

*McDonald v. Gaunt,* 30 id. 696, 2 Pac. 871; *Gollober v. Martin, Sheriff,* 33 id. 252, 6 Pac. 267; *Morse v. Ryland,* 58 id. 250, 48 Pac. 957.) The instruction might have been elaborated as to constructive knowledge of fraud by requiring a knowledge of facts sufficient to excite the suspicions of an ordinarily prudent man. Maxson was only bound to act as a man of ordinary prudence would, and could not be required to act up to the standard of a person who was particularly suspicious and cautious by nature. The word "ordinarily" was not used, but we think the jury would infer from the language used by the court that the standard of ordinary prudence was intended. The court might have added that every suspicion of fraud is not to be deemed the equivalent of notice, but that the facts within the knowledge of the purchaser must be of such a nature as in reason will put him upon inquiry, and exite the suspicions of an ordinarily prudent person; and that he is then chargeable with a knowledge of such facts as would have been gained by a diligent inquiry. The same idea is expressed in *Richolson v. Freeman,* 56 Kan. 467, 43 Pac. 772, where it was remarked that "a knowledge of facts sufficient to put one upon inquiry which, if duly prosecuted, would have disclosed such fraudulent intent, is equivalent to actual knowledge of the same." Our view, however, is that nothing in the language of either instruction misled the jury or furnishes ground for reversal.

A more serious objection is made to the ninth instruction, which reads as follows:

"If the jury find from the evidence that the said C. C. Vickers and wife made a conveyance of the property described in the plaintiff's petition to the said P. B Maxson for the purpose of hindering, delaying or defrauding the creditors of the said C. C. Vickers, or the creditors of the said W. L. Vickers

and C. C. Vickers, partners as W. L. Vickers & Co., then you are instructed that if the said P. B. Maxson, before he made the purchase of said property, or before he paid the consideration therefor, had knowledge that the said firm of W. L. Vickers & Co. was insolvent — that is, in failing circumstances and unable to meet their obligations as they matured — and that the creditors of the said C. C. Vickers were pressing their claims against him, then the said P. B. Maxson would be chargeable with notice of fraudulent intent of the said C. C. Vickers and wife, and he would not be a *bona fide* purchaser of said property, and your findings must be for the plaintiffs, unless you shall further find that the consideration which the said P. B. Maxson paid for said lands was a good and valuable consideration, and that the money paid by him was applied to the satisfaction of the debts of the said creditors of W. L. Vickers & Co. or the debts of the said C. C. Vickers.''

In effect this instruction holds that mere knowledge of the vendor's insolvency is, as a matter of law, sufficient to charge a purchaser with notice of a fraudulent purpose on the part of the vendor. It asserts the proposition that if Maxson knew that W. L. Vickers & Co. were in failing circumstances and unable to meet their obligations as they matured, and that creditors were pressing their claims against the firm when he purchased the land, he was chargeable with notice of the fraud of Vickers. The fact that persons are unable to meet their obligations as they mature does not necessarily indicate dishonesty, or that a sale made by them at that time is necessarily fraudulent; and yet the court ruled that a knowledge of this fact alone by Maxson made him a participant in the fraud of the vendor, although he may have had no knowledge of any facts or circumstances indicating Vickers's intent to commit a fraud. Insolvency and honesty are not necessarily antagonistic. Many persons not subject

to the charge of dishonesty are unable to meet their obligations as they mature, and it is not uncommon that such persons, through the indulgence of their creditors, reach ultimate success. A present inability to meet all debts as they mature does not point so unerringly to a fraudulent design that all persons who deal with such debtor and have a knowledge of the inability must infer that he intends to commit a fraud. The insolvency of a vendor is a circumstance to be considered in determining whether fraud exists, but it cannot be declared as a matter of law that insolvency alone is sufficient to establish fraud. In *Dobson v. Cooper*, 50 Kan. 680, 32 Pac. 370, it was said that "insolvency is an element of proof entitled to consideration in canvassing badges of fraud in order to determine the honesty of the transaction. Proof of insolvency does not necessarily establish fraud, but a sale of all his property by one insolvent is a circumstance which in connection with others may be sufficient to awaken suspicion and create a presumption of a fraudulent design." The supreme court of Nebraska has ruled that "the insolvency of the grantor in a deed of conveyance, although a circumstance which may be taken together with other material facts to show a fraudulent design in disposing of property, is not of itself sufficient to establish it." (*Leffel & Co. v. Schermerhorn*, 13 Neb. 342, 14 N. W. 418; *Albertoli v. Barnham*, 80 Cal. 631, 22 Pac. 404; *Dalton v. Thurston*, 15 R. I. 418, 7 Atl. 112; Bump, Fr. Conv., §§ 183, 184.)

The exception at the end of the instruction as to the payment of consideration does not neutralize the error that preceded it, as coupled with it is a requirement that the purchaser shall see to and be responsible for the application of the purchase-money to the payment

of the vendor's debts. The power to sell the property and to apply the proceeds among his creditors resides in the debtor. The fact that he is insolvent does not deprive him of the right to sell or mortgage his property in order to pay or secure his debts, nor to prefer creditors. In such cases debts cannot be paid until the property is sold or disposed of; and since the defendant has the unquestioned right to prefer one creditor to another, it is not easy to see how the purchaser is to be held to a proper application of the money paid. The insolvency of the debtor, the facts pointing to a fraudulent design, the circumstances surrounding the transaction, the knowledge and means of knowledge of the purchaser of the fraud, if any, of the vendor, may all be considered in determining the good faith of the purchaser and the validity of the sale; but it cannot be said that the insolvency of the vendor alone is sufficient to charge the purchaser for a full consideration with notice of a fraudulent intent on the part of the vendor. In view of the claim of good faith of Maxson in the purchase and the testimony tending to support it, the instruction was clearly and materially incorrect.

It is suggested that as a jury trial could not be had as a matter of right, and as the findings of the jury are not binding upon the court, the instruction, although erroneous, is unimportant. The facts were submitted to the jury for their determination, and their findings were accepted and adopted by the court as its own, and the case was treated in all respects as though a jury trial was a matter of right. In such case "the same rules obtain as those which govern cases triable to juries as a matter of right, unless the court thereafter dispenses with the jury for the purpose of trying the case itself." (*Loob v. Fenaughty*, ante, p.

570, 55 Pac. 841.) Here, it appears, the jury was not dispensed with, nor was independent consideration given to the facts by the court; and were we to overlook the findings of the jury, the instruction shows that the case was tried upon an erroneous theory — that is, that an incorrect rule was used by the court in weighing the testimony and in measuring the rights of the parties.

For the error mentioned the judgment will be reversed and the cause remanded for a new trial.